# United States Court of Appeals
## For the First Circuit

No. 06-2722

UNITED STATES OF AMERICA,
Appellee,

v.

SAMUEL BRISTOL-MÁRTIR,
Defendant, Appellant.

No. 06-2723

UNITED STATES OF AMERICA,
Appellee,

v.

CARLOS OLIVERAS-GONZÁLEZ,
Defendant, Appellant.

No. 06-2724

UNITED STATES OF AMERICA,
Appellee,

v.

FRANCISCO SANTIAGO-ALBINO,
Defendant, Appellant.

No. 06-2725

UNITED STATES OF AMERICA,
Appellee,

v.

OMAR MARRERO-CRUZ,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Carmen Consuelo Cerezo, U.S. District Judge]

———————————

Before

Torruella, Howard, Circuit Judges,
and DiClerico,* District Judge.

———————————

Lorenzo J. Palomares, for appellant Bristol-Mártir.
Lydia Lizarribar-Masini, for appellant Oliveras-González.
Jorge Luis Armenteros-Chervoni, for appellant Santiago-Albino.
Víctor González-Bothwell, Assistant Federal Public Defender,
with whom Joseph C. Laws, Jr., Federal Public Defender, and
Patricia A. Garrity, Assistant Federal Public Defender, were on
brief for appellant Marrero-Cruz.
Germán A. Rieckehoff, Assistant United States Attorney, with
whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and
Nelson Pérez-Sosa, Assistant United States Attorney, Chief,
Appellate Division, were on brief for appellee.

———————————

June 26, 2009

———————————

———————————

* Of the District of New Hampshire, sitting by designation.

-2-

**TORRUELLA**, **Circuit Judge**. This case involves an investigation into corruption in the Puerto Rico Police Department and the subsequent convictions of four police officers who were willing to escort cocaine to various locations throughout Puerto Rico. After a jury trial, the defendant-appellants Samuel Bristol-Mártir ("Bristol"), Omar Marrero-Cruz ("Marrero"), Carlos Oliveras-González ("Oliveras"), and Francisco Santiago-Albino ("Santiago") were convicted of a conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 846 and 841(a) (Count One). As detailed below, some of the officers were also convicted of other crimes involving drugs and firearms.

In this appeal, all defendants claim that the district court improperly handled an issue of juror misconduct. In addition, Santiago claims that there was insufficient evidence to sustain his conviction, that the district court erred in several of its evidentiary rulings, and that he was unfairly prejudiced by the district court's handling of a contemporaneous newspaper story regarding a similar police sting operation and an incident concerning his wife in which she was detained by court security personnel. Santiago and Bristol claim that delays during trial violated their rights under the Speedy Trial Act and the Sixth Amendment. Oliveras claims that he was entitled to a jury instruction on the defense of public authority. Finally, Bristol appeals part of his sentence.

We agree with the defendants' claims that the district court improperly handled the juror misconduct issue that arose during the jury's deliberations. Therefore, we vacate the defendants' convictions and remand for a new trial. Consequently, we need not reach the issues related to whether Santiago was unfairly prejudiced by the newspaper article and the incident involving his wife, whether the district court erred in denying Oliveras's request for a jury instruction on the defense of public authority, and whether it erred in sentencing Bristol. However, we need to decide the correctness of the district court's ruling regarding the sufficiency of the evidence to support Santiago's conviction as well as its evidentiary rulings, and affirm these rulings. We also pass upon Bristol and Santiago's claim under the Speedy Trial Act and the Sixth Amendment, and conclude that there was no violation.[1]

## I. Background

We recite the facts in the light most favorable to the verdicts. United States v. Carlos Cruz, 352 F.3d 499, 502 (1st Cir. 2003). The following facts are principally based on the

---

[1] We reach Santiago's sufficiency appeal because of double jeopardy principles. See Burks v. United States, 437 U.S. 1, 18 (1978) (holding that "the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient"); United States v. Meléndez-Rivas, 566 F.3d 41, 43 (1st Cir. 2009). We also reach Santiago and Bristol's claim under the Sixth Amendment and Speedy Trial Act because in rare instances a dismissal with prejudice is the appropriate remedy. See United States v. Dessesaure, 556 F.3d 83, 85 (1st Cir. 2009).

-4-

testimony of Alcohol, Tobacco, and Firearms ("ATF") agent Carlos Canino, an undercover agent who posed as a fictional narcotics trafficker from Miami; and Jamill Águila-Barrios, who was introduced to Canino through a confidential source ("CS") and assisted Canino in contacting police officers.

### A.   The Drug Operation

In early 2005, ATF agents began an investigation into corruption in the Puerto Rico Police Department ("PRPD") with the goal of identifying police officers willing to escort cocaine shipments.   Through the help of a CS, Canino enlisted the participation of the defendant police officers in escorting cocaine loads throughout Puerto Rico.

On February 21, 2005, Canino met with Marrero and Oliveras and told them he was a drug dealer from Miami who was trafficking cocaine through Puerto Rico, and that he needed uniformed police officers to help him move 30 kilograms through San Juan for $4,000 each per trip.   A few days later, Marrero and Oliveras, in uniform, helped Canino execute this plan, and they were paid $4,000 each in cash.   An identical operation was carried out with the help of Marrero and Oliveras just a few weeks later.

Soon thereafter, Canino informed Marrero that he needed to move 300 kilograms of cocaine, which would require the help of two additional police officers.   On March 5, 2005, Canino met with Marrero, Bristol, and another police officer.   At this meeting,

-5-

Canino talked about a plan to escort 300 kilograms of cocaine from a boat in a marina in San Juan or Fajardo. A few days later, Bristol, Marrero, and Oliveras helped execute the plan and were paid $5,000 each.

On March 31, 2005, Canino met with Bristol in part to discuss Bristol's possible access to more police officers who were willing to escort the drugs. Canino then proposed moving another 300 kilograms of cocaine with the help of a new police officer; however, Canino first wanted to do a test run with the new recruit, involving only 30 kilograms of cocaine. Canino told Bristol that he would include the new recruit in the 300 kilogram shipment if he was satisfied with the new recruit's performance during the 30 kilogram operation.

On April 6, 2005, Canino met with the CS, Bristol, and Santiago, a police officer Canino had not previously met, at an employee parking lot of the Wyndham El San Juan Hotel. At the parking lot, Canino explained the logistics of the drug operation to Bristol and Santiago, which involved escorting 30 kilograms of cocaine. Canino then gave Santiago and Bristol keys to a vehicle that Canino had provided to them, and instructed them on how to proceed. Canino told them that they were going to receive $4,000 each upon completion of the job.

Bristol and Santiago, driving in the vehicle provided to them by Canino, followed Canino and the CS to a plaza in Carolina,

Puerto Rico, where they picked up drugs from an ATF agent posing as Canino's associate. The drugs were loaded into Santiago and Bristol's vehicle. Santiago and Bristol then followed Canino and the CS to Río Hondo, Puerto Rico, where they dropped off the drugs in an another ATF agent's vehicle, who also represented himself as Canino's associate. Canino paid $4,000 each to Bristol and Santiago, after which they discussed the possibility of doing a 300 kilogram shipment of cocaine.

On April 28, 2005, Canino scheduled a meeting at a restaurant with Bristol, Santiago, and another officer. However, this meeting did not take place because Canino may have blown his cover when Santiago noticed Canino waiving off his undercover team with hand signals.

### B. Procedural History and Jury Deliberations

On November 30, 2005, a grand jury returned a superseding indictment against all defendants. Jury selection was held on February 14, 2006, and the trial began the next day. On March 15, 2006, after the defense had concluded its argument, the district court denied all pending Rule 29 motions. Closing arguments were held on March 22, 2006, and on March 23, 2006, the district court instructed the jury.

On March 23, 2006, shortly after the jury began to deliberate, the jury foreman sent the district court a note with a request from the jury to provide them with the definition of

certain terms used in the counts as well as an English/Spanish dictionary.  The district court responded by denying the request for a dictionary and informing the jury that the definitions of the terms they requested were included in the district court's instructions to the jury.  The district court also stated that it would read any instruction again and advised the jury to consider the instructions as a whole and not to give "special attention" to any one instruction over another.

Shortly after receiving the district court's response, the jury foreman submitted a second note which read as follows: "Your Honor: the jury needs an explanation of the following count: 'attempt to possess with intent to distribute narcotics.'"  The district court conferred with counsel for the parties, recalled the jury and repeated the instructions it previously gave for Counts Two, Four, Six, Seven, and Nine.

The following day, the court received another note from the jury foreman which read: "Your Honor, one of the jurors searched the internet yesterday for federal laws and terms definitions.  We need to know if this action disqualifies this juror.  Please let us know."

The district court immediately ordered the jury to cease deliberating.  It then called a meeting with counsel for both parties. In the presence of counsel, the court questioned the errant juror.  The errant juror admitted to searching the internet

because she disagreed with other jury members as to the meaning of the term "attempt to possess with the intent to distribute narcotics." She admitted to researching the words "attempt," "distribution," and "possess" and writing down, on paper, information she obtained in her search. The errant juror stated that she did not share or read the contents of this paper with other members of the jury. She claimed that she merely shared her point of view with other jury members.

The district court then asked the errant juror to leave the room so that it could speak freely to the attorneys on both sides. Attorneys on both sides pointed out to the district court that the errant juror had other documents with her, and one of these documents appeared to be a computer printout. The district court recalled the errant juror and asked her about the other papers in her hands. The errant juror stated that the papers contained her personal notes and were unrelated to her internet research. The errant juror again stated that she had not shared information from the papers with the other jurors and that she had not called any jurors to tell them what she had found.

The district court again asked the errant juror to leave the room. Some of the defendants' attorneys reiterated that they had seen a printout in the errant juror's hands and not personal notes. The errant juror was called in a third time and the district court asked if she had printout material. The errant

juror stated that she did not have any printout material and that she did not remember printing out any research. The errant juror also stated that she had told the other jurors that she performed research on the internet and informed them of her "position" on the case based on this research.

The errant juror again left the room. The district court then stated as follows:

> I had the impression she had a different color paper than the one she handed back to me now. These were some yellow pages and some white pages, which, of course, I didn't read the content, but the other one, there was another color paper.

Some of the defendants' attorneys stated that they doubted that the errant juror had presented all of the papers she had brought with her into the jury room. Specifically, they remarked that they had seen a paper with red letters or without lines that was not among those turned over to the court. The district court agreed, stating that "it is my perception also -- that she had another set of papers that she didn't hand over to the Court now."

The district court next called in the jury foreman, who said that the errant juror had shared information that she obtained in her research with the jury. The jury foreman stated that the errant juror read out loud from a note she had and spoke about the definitions of terms like "distribution" or "possess."

The district court excused the jury foreman, read portions of the errant juror's notes that were turned over to the

court into the record, and then asked the attorneys to provide their views on whether the extraneous material brought into the jury room affected the court's instructions on the law. Oliveras's attorney expressed concern that the errant juror had not been forthcoming about all of the documents she had brought into the jury room. The district court then stated: "Then we have to check with the other jurors, we have this doubt, this lingering doubt as to whether everything that she handed over as to what she had and she didn't read to the jury." Oliveras's attorney responded that the errant juror's comments expanded the count that was read to the jury and that her comments "might have tainted the whole jury." Bristol and Santiago's attorneys also raised "serious doubts about the note and content."

The court then recalled the jury foreman, showed him the paper obtained from the errant juror, and asked him to identify if it was the paper that had been read to the jury. The jury foreman said he was not sure which paper she read from, but that he believed that it was a yellow one. He stated that the errant juror had more than one paper in her hands and that the errant juror mentioned that she would read from the paper because she wanted to express her opinion the way she had written it the previous night. The district court asked him if another juror in closer proximity to the errant juror would be better able to identify the paper. The foreman identified a juror ("juror 'M'").

The court then called in juror "M" and questioned her about the incident. Juror "M" stated that the errant juror read from some part of a paper with a definition of a term. Juror "M" further stated that she did not see the specific papers from which the errant juror read because the errant juror was sitting behind her. However, juror "M" remarked that one of the papers was yellow and that two of the papers were white.

The district court excused juror "M" and then told the attorneys that among the papers obtained by the court were the errant juror's personal thoughts and conclusions and informed them they would not have access to those papers at the present time. Defendants' attorneys once again expressed their concerns with the errant juror's conduct. The district court stated that the errant juror "wasn't straightforward with the Court."

Juror "M" was recalled to answer a few more questions. She stated that she was in the best position to see the errant juror's papers. Further, she stated that the errant juror did give one definition of the term "distribution."

After hearing from attorneys from both sides, the district court ruled that the errant juror had to be disqualified. Three of the defendants' attorneys argued that the jury's deliberation was tainted and could not be cured by instruction. The government argued that before the district court considered discharging the jury, there were several curative steps it should

take, including individually questioning each juror to determine whether or not any jury member had been influenced by the errant juror's conduct.

The district court called in the jury with two alternates, one to substitute for the errant juror, who was excused, and the other to replace a juror who would be traveling. The district court then told the jury that they were to begin deliberations anew. The district court further instructed them not to do any outside research and not to consult any reports about the case in the newspapers, radio or television. Although the district court met with each juror individually about reading news reports related to the case and about performing outside research, the court did not ask the jurors about the errant juror's conduct or its effect on them.

On March 27, 2006, the district court, in a sealed order, ruled that the errant juror's research and subsequent statements to the other jurors did not taint the jury. The district court declined to disclose to the parties what was contained in a sealed exhibit because it contained "expressions regarding [the errant juror's] deliberative process." The district court concluded that everything which was read to the jury relevant to the errant juror's research was favorable to the defendants and that the errant juror's act of reading the definition could be cured. The district court decided to amend the initial instruction to include

an explanation of the phrase "with intent to distribute." Defendants subsequently filed a motion for a mistrial, which the district court denied. On April 4, 2006, the jury resumed deliberations and after approximately four and one-half hours found the defendants guilty.

Defendants were convicted as follows: The jury found all defendants guilty of conspiracy to distribute narcotics, in violation of 21 U.S.C. §§ 846 and 841(a) (Count One); it found Marrero and Oliveras guilty of attempt to possess with intent to distribute narcotics (Counts Two and Four), in violation of 21 U.S.C. §§ 846 and 841(a) and 18 U.S.C. § 2, and of carrying a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Three and Five); it found Marrero, Bristol and Oliveras guilty of attempt to possess with intent to distribute narcotics (Counts Six and Seven), in violation of 21 U.S.C. §§ 846 and 841(a) and 18 U.S.C. § 2, and of carrying a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Eight); and it found Bristol and Santiago guilty of attempt to possess with intent to distribute narcotics (Count Nine), in violation of 21 U.S.C. §§ 846 and 841(a) and 18 U.S.C. § 2, and of carrying a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Ten).

All defendants timely appeal.

## II. Discussion

### A. Sufficiency of Evidence as to Defendant Santiago

#### 1. Standard of Review

We review evidentiary sufficiency claims de novo. United States v. Ofray-Campos, 534 F.3d 1, 31 (1st Cir. 2008). "A district court's denial of a motion for acquittal must be affirmed 'unless the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant's guilt beyond a reasonable doubt.'" Id. (quoting United States v. Paradis, 802 F.2d 553, 559 (1st Cir. 1986)). We do not "weigh evidence or make credibility judgments," id., and "'must uphold any verdict that is supported by a plausible rendition of the record,'" id. at 32 (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2008)).

#### 2. Applicable Law

Here, Santiago was convicted of conspiracy to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 846 and 841(a) (Count One); aiding and abetting in an attempt to possess with intent to distribute narcotics, in violation of 21 U.S.C. §§ 846 and 841(a) and 18 U.S.C. § 2 (Count Nine); and aiding and abetting in carrying a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Ten). Santiago challenges the evidence on all counts.

-15-

With respect to Count One, "[t]o prove conspiracy, the government must show 'the existence of a conspiracy, the defendant's knowledge of the conspiracy, and the defendant's voluntary participation in the conspiracy.'" Hernández, 218 F.3d at 64-65 (quoting United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990)). "To establish that the defendants belonged to and participated in the drug conspiracy, the government must show two kinds of intent: 'intent to agree and intent to commit the substantive offense.'" Id. at 65 (quoting Gómez-Pabón, 911 F.2d at 853).

With respect to Count Nine, Santiago was convicted of aiding and abetting an attempt to possess with intent to distribute narcotics. "Aiding and abetting requires the government to show that a defendant 'participated in the venture and sought by [his] actions to make it succeed.'" Id. (quoting United States v. Guerrero, 114 F.3d 332, 341 (1st Cir. 1997). The government can satisfy this burden by showing "'that the defendant consciously shared the principal's knowledge of the underlying criminal act, and intended to help the principal.'" Id. (quoting United States v. Spinney, 65 F.3d 231, 235 (1st Cir. 1995)). We note that "[k]nowledge of the particular controlled substance being imported or distributed is not necessary, and intent to distribute can be inferred from the quantity of drugs involved." Id. (citations omitted).

"To prove attempt, the government must show that a defendant intended to commit the substantive offense and that he took a substantial step toward its commission." United States v. Gobbi, 471 F.3d 302, 309 (1st Cir. 2006). Where, as here, the substantive offense is possession of drugs with intent to distribute "possession may be either actual or constructive." Id. "Actual possession is 'the state of immediate, hands-on physical possession.'" Id. (quoting United States v. Zavala Maldonado, 23 F.3d 4, 6 (1st Cir. 1994)). On the other hand, "[c]onstructive possession occurs when 'a person knowingly has the power and intention at a given time to exercise dominion and control over an object, either directly or through others.'" Id. (quoting United States v. Ocampo-Guarin, 968 F.2d 1406, 1409-10 (1st Cir. 1992)). "Constructive possession of drugs may be inferred 'from a defendant's dominion and control over an area where narcotics are found.'" Id. (quoting United States v. Echeverri, 982 F.2d 675, 678 (1st Cir. 1993)).

Lastly, with respect to the weapons charge in Count Ten, to find the defendant guilty of aiding and abetting pursuant to 18 U.S.C. § 924(c), the government must show "that the defendant knew 'to a practical certainty' that some participant in the drug-trafficking crime would be using, carrying, or possessing a

firearm in furtherance thereof."[2]  United States v. Negrón-Narváez,
403 F.3d 33, 37-38 (1st Cir. 2005) (quoting United States v. Shea,
150 F.3d 44, 50 (1st Cir. 1998)).  For the purposes of this count,
Santiago can be found guilty even though "the gun [Santiago]
possessed was an inherent part of his employment as a police
officer."  United States v. Vázquez Guadalupe, 407 F.3d 492, 500
n.4 (1st Cir. 2005).

### 3.  Sufficiency Claim Is Unavailing

Santiago maintains that no rational jury could have found
him guilty beyond a reasonable doubt and that he must be acquitted
on grounds of insufficient evidence.  He argues that from the
evidence presented at trial a jury could not make out a reasonable
inference that he had the requisite knowledge and intent to
participate in the conspiracy charged in the indictment.

Specifically, Santiago points to Canino's March 31, 2005
meeting with Bristol where Canino inquired about using another
police officer in order to escort a cocaine shipment.  Santiago
argues that at no point in this meeting is his name suggested or
even mentioned.  Furthermore, Santiago argues that the jury could
not draw a rational inference of his guilt from the events of
April 6, 2005, when Canino met with Bristol and Santiago at the

---

[2] The statute of conviction applies to "any person who, during and
in relation to any crime of violence or drug trafficking crime
. . . for which the person may be prosecuted . . . uses or carries
a firearm, or who, in furtherance of any such crime, possesses a
firearm." 18 U.S.C. § 924(c)(1)(A).

parking lot of the Wyndham Hotel. Santiago states that he was not formally introduced as the alleged corrupt cop and that he was not "particularized" in any way. He notes that he only said "what's up?" and that at no point was he paying attention to the conversation between Bristol and Canino. Santiago maintains that Canino was only instructing Bristol as to how the drugs were to be transported. Santiago further asserts that there is no evidence that he was paid $4,000 for his part in the conspiracy. Finally, with respect to the weapons charge in Count Ten, Santiago maintains that since the government did not meet its burden in showing Santiago had the requisite intent for the conspiracy and aiding and abetting charges in Counts One and Nine, respectively, the government likewise did not meet its burden on the firearms count. Santiago relies on the fact that he was merely present at the scene and that he carried a gun as a police officer.

The record does not support Santiago's version of events and instead shows that the government met its burden at trial. Even if we were to disregard the March 31, 2005 planning meeting between Canino and Bristol, the events of April 6, 2005 provide sufficient evidence from which the jury could infer Santiago's guilt beyond a reasonable doubt. Specifically, at trial Canino testified that he gave Santiago and Bristol keys to a vehicle to use for the drug operation, instructed them on what to do, and told them that they were going to receive $4,000 each when they

-19-

completed the trip. Canino also testified that Bristol and Santiago drove in a separate car to pick up the drugs from Canino's associate; that they drove to meet another one of Canino's associates and dropped off the drugs in that associate's vehicle; and finally, that Canino paid Bristol and Santiago $4,000 each and proceeded to discuss participating in a larger transaction. Canino further testified that Santiago was present during all conversations, during the loading and unloading of drugs, and during the discussion of the 300 kilogram transaction.

Although Santiago maintains that he was merely present at the scene, a reasonable jury could credit Canino's testimony, as well as Jamill's corroborating testimony, which showed that Santiago was actively involved in the joint action. On appeal, we do not engage in credibility determinations. See Hernández, 218 F.3d at 66 n.5 ("It is not our role to assess the credibility of trial witnesses or to resolve conflicts in the evidence, instead we must resolve all such issues in favor of the verdict."). As detailed above, Canino's testimony implicates Santiago as an active participant in the drug operation who was rewarded for his involvement. This testimony, if believed, is sufficient to satisfy the elements of Counts One and Nine.

With respect to the weapons charge in Count Ten, Santiago cannot escape conviction on this count simply because he was otherwise obligated to carry a gun as part of his job as a police

officer.  A jury could rationally infer that Santiago also possessed the gun to further the drug crime.  For example, a jury could infer that one of the objectives of enlisting Santiago's "participation in the activity . . . was to prevent, by [his] presence, other drug dealers or other legitimately motivated police officers from interfering in and disrupting the transport of the drugs."  United States v. Villafañe-Jiménez, 410 F.3d 74, 83 (1st Cir. 2005).  Furthermore, a jury could infer that "the presence of the gun[], displayed in the open, by the Defendant[] as [an] active participant[] in the illegal activity, would have a tendency to discourage interruption of the transport by other persons."[3]  Id. Thus, because a jury could infer that Santiago "used his status as a police officer, which includes the fact that he carries a gun, in order to protect the drug transaction in which he engaged," Vázquez Guadalupe, 407 F.3d at 500 n.4, we conclude that there existed "an adequate nexus between [Santiago's] possession of the gun and the drug trafficking crime sufficient to support the charge."[4]  Id.

---

[3]  The government pointed to videotaped evidence which showed Santiago with his firearm during the drug transport.  See United States v. Sánchez-Berríos, 424 F.3d 65, 78 (1st Cir. 2005) (noting significance of videotaped evidence in upholding defendant's conviction).

[4]  Santiago also claims that the district court made three erroneous evidentiary rulings.  Specifically, he claims that the district court impermissibly allowed the introduction of transcripts with his name on them as a participant in three conversations, maintaining that he actually remained silent in two of the three recordings; that the district court erred in allowing hearsay testimony from Canino regarding whether Santiago noticed

-21-

## B. Juror Misconduct

### 1. Standard of Review

We review a district court's actions for abuse of discretion "[i]n the majority of our cases that have involved claims that a jury was improperly exposed to extrinsic information," including those cases that "involve the jury's accidental exposure to potentially prejudicial material that was not offered in evidence at trial," where "egregious circumstances" are not present, and where the "trial judge responds to the claim of contamination by conducting an inquiry and employing remedial measures." Ofray-Campos, 534 F.3d at 20-21. Here, because no

---

Canino's hand signal at the restaurant on April 28, 2005; and that the district court impermissibly excluded Santiago's explanation of why he was at the hotel parking lot as hearsay because Santiago referred to Bristol's out-of-court statements.

Santiago's arguments are unavailing. First, with respect to the transcripts, the jury never saw Santiago's name on the two transcripts he cites because the court struck his name from those transcripts. Second, with respect to Canino's statement at the restaurant, the district court did not err because Canino simply testified as to observing Santiago's reaction. See Fed R. Evid. 801(c). Third, with respect to Santiago's testimony referencing a conversation with Bristol, the district court correctly concluded that Bristol's out-of-court statements were hearsay because they were being offered for the truth of the matter asserted. See id.

Even if we were to conclude that the district court committed an evidentiary error here, it would be harmless given the overwhelming amount of evidence against Santiago.

egregious circumstances are present, the applicable standard of review is abuse of discretion.[5]

## 2. Applicable Law

"'When a non-frivolous suggestion is made that a jury may be biased or tainted by some incident, the district court must undertake an adequate inquiry to determine whether the alleged incident occurred and if so, whether it was prejudicial.'" United States v. Barone, 114 F.3d 1284, 1307 (1st Cir. 1997) (quoting United States v. Ortiz-Arrigoítia, 996 F.2d 436, 442 (1st Cir. 1993)). The twin goals of this duty to investigate are "to ascertain whether some taint-producing event actually occurred, and

---

[5] The Supreme Court has held that in criminal cases "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is . . . presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." Remmer v. United States, 347 U.S. 227, 229 (1954). Although we have questioned the continued vitality of the "Remmer Presumption," see United States v. Bradshaw, 281 F.3d 278, 287-88 (1st Cir. 2002), recently we have held an instance of juror misconduct to be presumptively prejudicial and reviewed the district court's act of permitting the jury to consider information not in evidence under a de novo standard because it is error per se, Ofray-Campos, 534 F.3d at 19-22 (holding presumption of prejudice appropriate because trial court provided new evidence to the jury that confirmed that co-defendants who did not appear at trial were incarcerated for their role in conspiracy); see also United States v. Santana, 175 F.3d 57, 65 (1st Cir. 1999) (holding presumption of prejudice appropriate where trial court allowed jury to consider as evidence of guilt information presented for first time in deliberations). While the errant juror's misconduct in the instant case was serious, egregious circumstances such as those present in Ofray-Campos and Santana, cases where the trial court supplied extrinsic information to the jury, do not exist here. Thus, we conclude that abuse of discretion is the appropriate standard of review here.

-23-

if so, to assess the magnitude of the event and the extent of any resultant prejudice." Bradshaw, 281 F.3d at 289. If such an event is present and the potential for prejudice exists, "the court must then consider the extent to which prophylactic measures (such as the discharge of particular jurors or the pronouncement of curative instructions) will suffice to alleviate that prejudice." Id. The district court must engage in a "'methodologically sound'" investigation, id. at 291 (quoting United States v. Boylan, 898 F.2d 230, 259 (1st Cir. 1990)), "to ensure that the parties 'receive[] the trial by an unbiased jury to which the Constitution entitles them,'" id. at 289-90 (quoting United States v. Anello, 765 F.2d 253, 258 (1st Cir. 1985) (alteration in original)). We recognize that "the trial court has wide discretion to fashion an appropriate procedure for assessing whether the jury has been exposed to substantively damaging information, and if so, whether cognizable prejudice is an inevitable and ineradicable concomitant of that exposure." Id. at 290.

### 3. District Court Abused Its Discretion in Investigating Juror Misconduct

The government argues that the court effectively minimized the potential for jury contamination in this case, or, at the very least, the defendants were not prejudiced by the court's approach. The government points to the fact that upon receiving a jury note calling the court's attention to the errant juror's actions, the district court immediately ordered the jury to stop

deliberating. The government states that the district court then conducted an inquiry with the errant juror, the jury foreman, and the juror sitting closest to the errant juror to discern whether the jurors were in fact prejudiced by their exposure to outside material. Furthermore, the government notes that the court employed remedial measures, such as dismissing the errant juror and re-questioning all jury members, emphasizing that they were not to engage in any outside research or investigation.

Although we accord the district court great flexibility in applying a curative procedure in the face of juror misconduct, we must still resolve "whether the trial court investigated the claim appropriately and resolved it in a satisfactory manner." Id. Here, we acknowledge the lengths to which the district court went -- it investigated the juror misconduct by engaging counsel on both sides and speaking multiple times to the errant juror, the jury foreman, and another juror. However, crucially, the district court did not inquire, either in a group setting or on an individual basis, as to whether jury members had been influenced by the errant juror's improper research and presentation. In its re-questioning of jury members, the district court made only slight modifications to its generic instructions and made no mention of the errant juror's improper communications. Our case law has consistently emphasized that the district court, in conducting its investigation, must ensure that jury members can remain impartial

when they have been exposed to extrinsic information that is potentially prejudicial.  See id. at 293 n.8 (holding no abuse of discretion exists in case where "the retained jurors warranted that they would not consider [the information to which they were exposed that was not evidence]; and [the jurors] added that, in all events, what they had seen or heard would not influence their judgment"); Boylan, 898 F.2d at 262 (concluding that there was no abuse of discretion in light of "jurors' assertions of continued impartiality"); see also United States v. Yeje-Cabrera, 430 F.3d 1, 11 (1st Cir. 2005) (holding that there was no abuse of discretion where the district court questioned the jury as a group regarding improper discussions with an errant juror and invited individual jurors to contact it later if they found the need to do so).

The district court's failure to question all jury members regarding their ability to remain impartial in light of the errant juror's misconduct was especially important given the challenges in ascertaining what went on in the jury room.  As described above, there were indications, which the district court acknowledged, that the errant juror did not truthfully express the details of her presentation and was not forthcoming regarding the documents upon which she relied.  Further, the jury foreman and the other juror questioned could not fully recollect what the errant juror had said to the jury.  Given the uncertainty surrounding the errant juror's presentation, the district court erred in its decision not to

mention the errant juror's improper communications in its re-questioning of the remaining jury members. Thus, we have no way of knowing whether the errant juror's internet definitions unduly influenced a jury member's finding of guilt. This additional inquiry regarding the errant juror's communications would not have been burdensome because the district court was already interviewing each of the jurors individually in order to inform them not to read the news or perform ex parte research.[6] We conclude that the district court's handling of the errant juror's misconduct constituted an abuse of discretion because it compromised the defendants' right to have a trial by an unbiased jury.[7]

---

[6] There was a piece in the local newspaper that day that discussed a similar police sting operation and mentioned the four defendants. Prior to meeting individually with each juror, the district court explained to counsel that it wanted to find out if the story had influenced any jury member.

[7] Although the dissent makes much of this court's decision in <u>Yeje-Cabrera</u>, our ruling here is consistent with that case. Specifically, our holding here does not require the district court in every case in which it discovers juror misconduct to re-question all jury members. Rather, a "methodologically sound" investigation of juror misconduct entails an inquiry as to the effect of the misconduct upon the jury. The district court in <u>Yeje-Cabrera</u> did precisely that, when, in order to determine whether the errant juror in that case had shared any information with another jury member, it asked the jury as a group whether they had discussed the case among themselves. 430 F.3d at 10. Because the district court was satisfied that there was no contact between the errant juror and other jury members, we concluded that the district court did not abuse its discretion in deciding that it was not necessary to further question each jury member individually or as a group. <u>Id.</u> at 11. Here, by contrast, it is clear that the errant juror shared her information with the entire jury. Also, the district court, in its re-questioning of jury members, did not inquire about what was said by the errant juror and the effect of these statements on

## C. Defendants' Remaining Claims

Defendants Bristol and Santiago argue that their right to a speedy trial was violated by the district court under the Speedy Trial Act and the Sixth Amendment.[8]  Specifically, Bristol argues that he was prejudiced because the summation arguments occurred after an unreasonable delay and that the lapse in time affected jurors' memories.  Similarly, Santiago maintains that constant interruptions and lengthy delays during trial may have interfered with the jury members' abilities to be impartial, may have caused

_____

other jury members.  This fact, taken together with the imprecise recollection of the errant juror's presentation by the jury foreman and juror "M" as well as the serious doubts concerning the truthfulness of what the errant juror reported to the district court, supports our conclusion that the district court abused its discretion.  As mentioned above, we believe that this decision is consistent with our case law where we have stressed that a district court should get assurances from remaining jury members that their impartiality would not be affected by misconduct.  See Bradshaw, 281 F.3d at 293 n.8; Boylan, 898 F.2d at 262.

We note that immediately before the jury was called back in for re-questioning, the government stated that its suggested remedy "before the Court even considers discharging this jury" was "to talk to each juror individually and see what was the influence that [the errant juror's] definitions had on them, if any."  The district court here did not do this.

[8]  "The Sixth Amendment provides that '[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial.'" United States v. Nelson-Rodríguez, 319 F.3d 12, 60 (1st Cir. 2003) (quoting U.S. Const. amend. VI) (alteration in original).  Santiago and Bristol cite to the Supreme Court's four-factor test in Barker v. Wingo: "Length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. 514, 530 (1972).  They also assert a violation of § 3161(h) of the Speedy Trial Act. 18 U.S.C. § 3161(h).

-28-

them to forget testimonial evidence, and may have affected their weighing of the evidence. Santiago also adds that because the district court divided its time among numerous other trials and cases, it caused delay, injustice, and confusion to the parties and the jurors.

We disagree with defendants' assertions. Even if we were to apply the Sixth Amendment and the Speedy Trial Act beyond the pre-trial phase, defendants' claims fail. In an April 11, 2005 order, the district court carefully explained why the trial lasted more than six weeks with only eleven days of trial time. These reasons included holidays, jurors' absences to which all parties consented, motions by the parties, and the aforementioned juror misconduct issue. Although the district court's trial schedule may be unusual, we have noted that "'[t]rial management is peculiarly within the ken of the district court,'" Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 139 (1st Cir. 2006) (quoting United States v. Saccoccia, 58 F.3d 754, 770 (1st Cir. 1995)). The district court provided compelling reasons for why it had to interrupt and delay trial proceedings, and consequently we hold that neither defendants' constitutional nor their statutory rights under the Speedy Trial Act were offended here.[9]

---

[9] Bristol and Santiago speculate on the effect of the delays and interruptions on jury members' memories. Notably, a great deal of evidence was recorded on audio or videotape, lessening the need for jury members to rely exclusively on their memories.

Because we are remanding for a new trial on the juror misconduct issue, we need not reach whether Santiago was unfairly prejudiced by the newspaper piece and the incident involving his wife; whether the district court erred in denying Oliveras's request for a jury instruction on the defense of public authority; and whether it committed an error in sentencing Bristol.

### III.  Conclusion

We conclude that there was sufficient evidence to convict Santiago and affirm the district court's ruling on that issue.  We also conclude that Bristol and Santiago's rights under the Sixth Amendment and Speedy Trial Act were not violated.  However, we hold that the district court abused its discretion in its handling of the juror misconduct issue.  Consequently, we vacate the defendants' convictions and remand for a new trial.

**Vacated and Remanded**.

**"Dissenting opinion follows"**

-30-

**HOWARD**, <u>Circuit Judge</u> **(dissenting in part)**. I join in the lion's share of the majority's well-reasoned opinion. I write separately on one issue, however, because I do not agree that the district court abused its discretion in handling the juror misconduct issue. <u>See</u> <u>supra</u> Sec. II.B.

Although the majority cites our decision in <u>United States</u> v. <u>Yeje-Cabrera</u>, 430 F.3d 1 (1st Cir. 2005), I calibrate differently the impact of that decision -- which has a fact scenario remarkably similar to this one -- on our consideration of this case. In <u>Yeje-Cabrera</u>, a note from a juror during the course of trial (concerning the defendants' failure to testify) raised the question of whether she had discussed the case with other jurors prior to deliberations, contrary to the court's instructions. 430 F.3d at 10. After revealing the note to counsel, the court declined defense counsel's suggestions that he interview the note-writing juror and the others individually to ascertain whether discussions had taken place. <u>Id.</u> at 10. Instead, the judge issued a curative instruction, reiterating the "no-discussion" rule, and asked the jury, as a group, whether any such discussions had taken place. No juror admitted as much in the group setting. <u>Id.</u> No action was taken against the juror at this time.

The same juror complained multiple times the next day about the course of trial, and was dismissed prior to that day's proceedings. <u>Id.</u> at 10-11. The judge denied the defendant's

request to interview the remaining jurors individually, satisfied with their previous group answer and the fact that they could not have had additional contact with the rogue juror. Id. at 11.

On appeal, the defendant claimed that the group request was inadequate due to peer pressure, and that individual questioning should have occurred to determine if the jury had followed instructions. Id. We framed the question as follows: "Here the claim of taint is not about the juror herself, she was dismissed . . . . The question is whether she tainted the others." Id. at 11. That is the same question we face here. We also said that while en masse questioning may conceivably discourage an honest answer, the court's invitation to allow individuals to contact the court with issues sufficed to overcome any individual reluctance. Id. Significantly, we noted that even if the rogue juror had communicated her views on the defendants' failure to testify, "there is no reason to think those jurors were dissuaded from following the instructions of the judge . . . ." Id.

The trial court here followed a different path, but in my view achieved the same acceptable outcome as in Yeje-Cabrera. First, the fact that the rogue juror was essentially "turned in" by her fellow jurors suggests that the remainder of the jury took the instruction on outside research seriously from the beginning. Next, after the juror was dismissed, there was (unlike in Yeje-Cabrera) individual questioning in which the court reminded the

jurors of their obligations not to do outside research. Additionally, during the individual, in-chambers voir dire, the trial court reminded each juror to contact the court via written note with any concerns. Finally, in addition to issuing a curative instruction reiterating the individual instructions, the court ordered the jury to re-start deliberations from the beginning with the addition of two new jurors. This was a stronger curative measure than took place in Yeje-Cabrera, where the jury simply resumed deliberations where it had left off.

While individual questioning as to taint may have been preferable -- just as individual questioning in Yeje-Cabrera might have been preferable -- the combination of the dismissal of the juror, the individual instructions, the re-instruction, and the re-commencement of deliberations lead me to conclude that the trial court did not abuse its discretion. "This was a difficult situation and the trial judge acted well within the range of permissible options." Yeje-Cabrera, 430 F.3d at 11.

-33-