**ATLANTIC RESEARCH MARKETING SYSTEMS, INC., Plaintiff,**

v.

**Stephen P. TROY, Jr., and Troy Industries, Inc., Defendants.**

**Civil Action No. 07–11576–PBS.**

United States District Court, D. Massachusetts.

May 5, 2009.

Craig M. Scott, Christine K. Bush, Scott & Bush, Ltd., Providence, RI, for Plaintiff.

Damian R. Laplaca, Christian G. Samito, Nicholas A. Ogden, Donovan & Hatem, LLP, Boston, MA, Ann Lamport Hammitte, Carla Miriam Levy, Thomas P. McNulty, Lowrie, Lando & Anastasi, LLP, Cambridge, MA, for Defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. INTRODUCTION

This patent infringement case involves handguards for guns such as M16s. Plaintiff Atlantic Research Marketing Systems, Inc. ("ARMS") holds U.S. Patent No. 6,499,245 ("the '245 Patent"), reissued as U.S. Patent No. RE39,465, entitled "Modular Sleeve Yoke" ("the '465 Patent"). Defendants and counterclaimants Stephen P. Troy, Jr. and Troy Industries, Inc. (collectively "Troy") hold U.S. Patent No. 7,216,-451, entitled "Modular Hand Grip and Rail Assembly for Firearms" ("the '451 Patent").

ARMS filed a complaint against Troy, its former employee, claiming, among other things, that Troy's handguard rail systems infringe claims 31 to 36 of the '465 Patent, and seeking a declaration that the '451 Patent is invalid or owned by ARMS.[1] Troy has filed counterclaims against ARMS seeking a declaration that the '465 Patent is not infringed, is invalid, or is

---

1. ARMS also asserts counts alleging misappropriation of trade secrets, unfair competi- tion, violation of Mass. Gen. Laws ch. 93A,

unenforceable, and asserting that ARMS is infringing on claims 1, 6, and 10 of the '451 Patent.

Both sides requested a hearing to construe disputed claim terms in the '451 and '465 Patents under *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).[2]

## II. FACTUAL BACKGROUND

The M–16 and AR–15 rifles are used by military and law enforcement personnel as well as by private gun owners. These guns include a shoulder stock, a receiver, and a barrel. The receiver is usually formed by two components: an upper receiver, to which the barrel is connected, and a lower receiver, which receives the ammunition clip and holds the trigger. As illustrated in the photo below, the barrel is connected to the upper receiver by a barrel nut, which screws to a threaded receptacle on the receiver.

A rifle is generally held with one hand on the trigger grip and with the other hand on a handguard that surrounds the barrel of the weapon. The handguard is needed to protect the user's hand because the barrel reaches high temperatures as the weapon is fired. A handguard can also serve as an attachment point for various accessories, such as lasers, sights, and scopes.

Earlier handguard models attached directly to the barrel of the weapon, typically behind the front sight, as seen below.

conversion, breach of contract and breach of fiduciary duty.

2. As discussed at the hearing, the proposals to construe the terms "interface channels," "bottom firearm accessory," "flanges," and "mating" were untimely, and thus the Court does not construe those terms.

**Colt M16A4 5.56mm Rifle**

This configuration had disadvantages. First, attaching the handguard directly to the barrel transfers at least some of the weight of the handguard and any attached accessories to the front of the barrel. When the barrel heats up as the gun is fired, this added weight can cause the barrel to droop, diminishing the accuracy of the weapon and sometimes causing the weapon to burst, inflicting extreme injury on the user. Additionally, heat can be transferred from the barrel to the handguard, causing the handguard to become too hot to hold. The handguards at issue here avoid these problems because they do not attach directly to the barrel of the weapon.

## III. DISCUSSION

To decide a patent infringement case, a court must determine the meaning of the claim terms. The interpretation of claim terms is "exclusively within the province of the court." *Markman*, 517 U.S. at 372, 116 S.Ct. 1384. In construing a claim, the Court must first "look to the words of the claims themselves ... to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). The language of the patent claims should be given first priority in the patent construction process because "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed.Cir.2005) (*en banc*) (quoting *Innova/Pure Water,*

*Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed.Cir.2004)).

Terms in the patent claims "are generally given their ordinary and customary meaning." *Vitronics*, 90 F.3d at 1582. The Federal Circuit has held that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1313. This "inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Id.*

In interpreting a given claim term, the Court looks to all intrinsic evidence. The Court consults the claims themselves, which "provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. By examining "the context of the surrounding words of the [disputed] claim," an interpreter may properly comprehend and "determin[e] the ordinary and customary meaning of those [disputed] terms." *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed.Cir. 2003).

Additionally, claims "must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed.Cir. 1995)). The "specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single

best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics,* 90 F.3d at 1582).

■■■ The Court "should also consider the patent's prosecution history, if it is in evidence." *Markman,* 52 F.3d at 980. "Like the specification, the prosecution history provides evidence of how the [Patent and Trademark Office] and the inventor understood the patent." *Phillips,* 415 F.3d at 1317. However, prosecution histories "often lack[ ] the clarity of the specification and thus [are] less useful for claim construction purposes." *Id.*

■■■ However, "[w]hile claims often receive their interpretative context from the specification and the prosecution history, courts may not read limitations into the claims." *Rambus Inc. v. Infineon Techs. AG,* 318 F.3d 1081, 1088 (Fed.Cir.2003) (citing *Comark Commc'ns, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed.Cir.1998)). Courts must not import "limitations from the specification into the claims absent a clear disclaimer of claim scope." *Andersen Corp. v. Fiber Composites, LLC,* 474 F.3d 1361, 1373 (Fed.Cir.2007) (citing *Gillette Co. v. Energizer Holdings, Inc.,* 405 F.3d 1367, 1375 (Fed.Cir.2005)). Additionally, "when a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim.'" *Amgen Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1326 (Fed.Cir.2003) (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1122 (Fed.Cir.1985)).

■■■ In contrast to intrinsic evidence, extrinsic evidence, "consist[ing] of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," is less favored in the claim construction analysis. *Markman,* 52 F.3d at 980. Although the Federal Circuit has expressly "authorized district courts to rely on extrinsic evidence," *Phillips,* 415 F.3d at

1317, it warned that such exogenous evidence is "less significant than the intrinsic record in determining the 'legally operative meaning of disputed claim language.'" *C.R. Bard, Inc. v. U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed.Cir.2004) (quoting *Vanderlande Indus. Nederland BV v. Int'l Trade Comm'n,* 366 F.3d 1311, 1318 (Fed. Cir.2004)).

## A. *The '451 Patent*

■■■ Plaintiff has requested that the Court interpret the meaning of the terms "fasteners," "holes," and "openings" found in claims 1, 6, and 10 of the '451 Patent. The three terms are used in the same manner in all three claims. Claim 1 is representative:

> A modular hand grip for use on a firearm, the modular hand grip comprising:
>
> an upper portion having a forward end, a rearward end, an inner surface and an outer surface, the rearward end is configured to engage a top portion of a barrel nut;
>
> lug rails project from the inner surface of upper portion at opposing sides and proximate edges thereof, the lug rails extend longitudinally from proximate the forward end to a position proximate the rearward end and include a plurality of gaps formed therein;
>
> a clamp assembly for engaging a bottom portion of the barrel nut is attached to the rearward end of the upper portion, the clamp assembly includes a clamp element having a central recess configured to receive the barrel nut, and flanges extending to opposing sides and attached to the edges at the rearward end of the upper portion, wherein the flanges are attached to the rearward end with **fasteners** that are inserted through

**openings** in the flanges and into **holes** in engagement portions of the edges of the upper portion; and

a lower portion having a top section and opposing side sections extending therefrom and each terminating at an edge, a plurality of spaced apart lugs extending from each edge and receivable in the gaps in the lug rails of the upper portion and translatable in one of a forward direction and a rearward direction positioning the lugs under the lug rails.

'451 Patent col. 4, ll. 23–49.

### 1. Fasteners

Plaintiff contends that "fasteners" should be limited to threaded fasteners. Defendants argue that the term "include[s] any mechanism used for attachment" and should be defined as "a device for attaching or connecting elements."

Figure 4 of the '451 Patent shows fasteners being inserted through openings (in 34) and into holes (in 31):

FIG.4

To supports its more limited interpretation, Plaintiff argues that the fasteners in Figure 4 appear to be threaded, and the specification mentions fasteners being inserted into threaded holes. '451 Patent col. 4, ll. 16–17.

The language of claim 1, however, is unlimited by the word "threaded." Plaintiff's argument is a transparent effort to import limitations from the specification into the claim, contrary to the rules of claim interpretation. The meaning of "fasteners" is clear from the language of the claims, as a means of attachment for two components of the device.

As used in claims 1, 6, and 10 of the '451 Patent, "fastener" means *a device for attaching or connecting elements.*

### 2. Openings & Holes

 Plaintiff argues that "opening" should be defined as *"unthreaded* space, open on both ends, serving as a passage" and "hole" as "a *threaded* space that has a

finite depth." Defendants suggest defining "opening" as "an open space, a breach, an aperture" and "hole" as a "cavity that can extend completely through a solid body, but is not required to do so."

Figure 4 of the '451 Patent, shown above, depicts both openings (in 34) and holes (in 31).

▮▮▮ Defendants argue that "holes" and "openings" are synonymous, noting that the American Heritage Dictionary gives "opening" as one definition of "hole." *The American Heritage Dictionary of the English Language* 837 (Houghton Mifflin Co., 4th ed. 2004). Plaintiff responds by pointing to the presumption that when two similar terms are used in one claim, the terms have different meanings. *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. K.G.*, 224 F.3d 1308, 1317 (Fed.Cir.2000). However, "the use of two terms in a claim requires that they connote different *meanings*, not that they necessarily refer to two different *structures*." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n. 3 (Fed.Cir. 2006) (citing *CAE Screenplates*, 224 F.3d at 1317).

There is no evidence to support Plaintiff's contention that an opening must be unthreaded or that a hole must be threaded. The claims make no reference to such properties. Plaintiff bases its argument on the fact that the specification states that fasteners can be "inserted through openings in flanges and into threaded holes," explicitly describing holes as threaded, whereas the specification attaches no adjective to "opening." '451 Patent col. 3, ll. 16–17. Once again, this is an inappropriate attempt to import limitations from the specification into the claim. Defendants' reference to a "solid body" is likewise not grounded in the claim language.

The only distinction found in the claims between "opening" and "hole" is that the fasteners are inserted "*through* openings" and "*into* holes." '451 Patent col. 4, ll. 40–41 (emphasis added). The fact that something can be inserted through an opening indicates that the opening has both an entrance and an exit. The fact that something can be inserted into a hole implies that the hole has an entrance, but not necessarily an exit.

The specification supports this distinction. Like the claims, the specification also states that fasteners are "inserted through openings in flanges and into threaded holes." '451 Patent col. 3, ll. 16–17. Thus the specification also indicates that a fastener can be inserted through an opening and then into a hole, meaning that the opening must have both an entrance and an exit to allow the fastener to enter the hole.

This distinction is consistent with at least one of the dictionary definitions of the terms. The American Heritage Dictionary gives "an open space serving as a passage or gap" as one definition for "opening" and "a hollowed place in something solid; a cavity or pit" as one definition of "hole." *The American Heritage Dictionary of the English Language, supra*, at 1232, 837. The distinction also satisfies the presumption that the two claim terms have different meanings.

As used in claims 1, 6, and 10 of the '451 Patent, therefore, "opening" means *an open space, breach or aperture with an entrance and an exit*, and "hole" means *an open space, breach or aperture with an entrance, but not necessarily an exit.*

## B. *The '465 Patent*

▮▮ Defendant has requested that the Court interpret "upper handguard piece," "rearward end," "support," "engage," "U-shaped" and "yoke" found in claim 31 of the '465 patent. With the disputed claim terms in bold, claim 31 reads:

A system for attaching modular enhancements to a firearm, said firearm having a receiver, said receiver having a top and a barrel receiving receptacle at a forward end thereof, said firearm further including a barrel received in said barrel receiving receptacle and a barrel nut received around an outer surface of said barrel receiving receptacle to retain said barrel within said barrel receiving receptacle, said system comprising:

an **upper handguard piece** having a forward end and a **rearward end,** and further having a dovetail rail extending longitudinally between the forward end and the **rearward end;**

a **U-shaped supporting yoke** removably secured to said **rearward end** of said upper handguard,

said **U-shaped supporting yoke** including engagement surfaces configured to cooperatively **engage** an outer surface of said barrel nut and thereby **support** said **upper handguard piece** relative to said barrel nut,

wherein said **upper handguard piece** extends from said forward end of said upper receiver forwardly above said barrel without engaging said barrel.

'465 Patent col. 16, l. 62—col. 17, l. 16.

### 1. Upper Handguard Piece

Troy proposes construing "upper handguard piece" as meaning "a front grip for a firearm to protect the hands of the user from the heat of the barrel, which attaches to the upper receiver." ARMS proposes a definition of "a device for use on a firearm that surrounds, at least partly, but does not touch, the top of the barrel."

Figure 5 from the '465 Patent depicts the upper handguard piece and the lower handguard piece:

FIG. 5

Both parties define "upper handguard piece" using limitations not found in the claims. Particularly, Defendants seek a limitation of attachment to the upper receiver via a receiver sleeve. They argue that because every mention of "upper

handguard piece" in the specification is accompanied by a reference to a receiver sleeve, the term should be construed to include attachment to the upper receiver via a receiver sleeve. *See, e.g.,* '465 Patent col. 6, ll. 39–41, col. 10, ll. 22–25. This, however, is an attempt to import needless limitations from the specification.

■ Defendants also argue that because the '465 Patent repeatedly defines "the present invention" to include attaching the upper handguard piece to the upper receiver via a receiver sleeve, "upper handguard piece" must be construed to include attachment to the upper receiver via a receiver sleeve. The phrase "the present invention" may limit the meaning of claim terms if a contrary result is not warranted. *See Netcraft Corp. v. eBay Inc.,* 549 F.3d 1394, 1398 (Fed.Cir.2008). However, the phrase does not limit the meaning of claim terms "automatically," and "such language must be read in the context of the entire specification and prosecution history." *Id.*

Here, the prosecution history is revealing. The '465 Patent is a reissue of the '245 Patent. Although the specification remained the same in the reissued patent, claims 11–36 were newly added. As Richard Swan, the inventor of the '245 Patent, declared during the prosecution of the reissue patent, he was seeking the reissue patent because

> [t]he Applicant's attorney failed to appreciate the full scope of the invention. Claims 1 and 6 are directed to a modular sleeve for attaching modular enhancements to a firearm, each reciting a universal receiver sleeve, an upper handguard, a lower handguard and a U-shaped device (yoke). The invention lies, at least in part, in the unique clamping arrangement of the yoke and the upper handguard. However, each of the claimed elements is described with narrow specificity and includes details en-

tirely unrelated and unnecessary to define the underlying yoke invention. Failing to appreciate the full scope of the invention relating to the yoke element and its unique role in engaging the barrel nut and supporting the upper handguard on the upper receiver, the Applicant's attorney too narrowly defined the universal receiver sleeve, the upper handguard, the bottom handguard and the U-shaped device (yoke). By including overly narrow limitations in the peripheral elements and in the yoke itself, in the independent claims, all of the claims are rendered wholly or partially inoperative for protecting the full scope of the invention.

(Pl.'s Br. in Resp. Ex. 7 at 2.) The prosecution history thus reveals that claim 31 was added in part because the earlier patent had too narrowly defined the upper handguard and understated the support provided by the U-shaped device. Original claims 1 and 6 specifically state that the upper handguard piece is "joined to the underside of the forward portion of the receiver sleeve," and the receiver sleeve, in turn, is "fixedly attached to the firearm receiver top." '465 Patent col. 11, ll. 33–34, 40–42; '465 Patent col. 12, ll. 62–64, col. 13, ll. 3–5. Additionally, the U-shaped device is not described as providing support to the upper handguard. '465 Patent col. 11, l. 63–col. 12, l. 15; '465 Patent col. 13, ll. 28–50. Newly added claim 31, on the other hand, does not describe the upper handguard piece as connected to the receiver sleeve or upper receiver, and describes the U-shaped device as "engag[ing] ... [the] barrel nut and thereby support[ing] [the] upper handguard piece relative to [the] barrel nut." '465 Patent col. 17, ll. 10–12. Claim 31 thus eliminates the requirement that the upper handguard piece be connected to the upper receiver via a receiver sleeve, such that "upper handguard piece" is no longer "too narrow-

ly defined," and describes the U-shaped device's "unique role in engaging the barrel nut and supporting the upper handguard on the upper receiver." (Pl.'s Br. in Resp. Ex. 7 at 2.)

In response, the Defendants argue that the prosecution history actually favors them, because Swan's declaration refers to the yoke element's "unique role in engaging the barrel nut and supporting the upper handguard *on the upper receiver*," thereby indicating that the upper handguard must be attached to the upper receiver via a receiver sleeve. (*Id.* (emphasis added).) The language of claim 31, however, indicates that the barrel nut is attached to the upper "barrel receiving receptacle" at the forward end of the receiver. As the upper handguard is supported by the yoke and barrel nut, the upper handguard is therefore supported on the barrel nut at the barrel receiving receptacle on the upper receiver. '465 Patent, col. 16, ll. 62–67 (the "receiver [has] ... a barrel receiving receptacle," and the "barrel nut [is] received around ... [the] barrel receiving receptacle"). While the Swan declaration does have some ambiguity, it does not support the Defendants when the claim language is viewed in its entirety. The prosecution history thus indicates that the use of the phrase "the present invention" does not limit the meaning of "upper handguard piece" to require attachment to the upper receiver via a receiver sleeve.

Construing "upper handguard piece" not to require attachment to the upper receiver via a receiver sleeve also satisfies the doctrine of claim differentiation. While the claims in the initial patent describe the upper handguard piece as attaching to the upper receiver via a receiver sleeve, claims 31–36 do not. Terms should not be construed in a way that "wound render additional, or different, language in another independent claim superfluous." *Curtiss– Wright Flow Control Corp. v. Z & J Techs.*

*GmbH,* 563 F.Supp.2d 1109, 1118 (C.D.Cal. 2007). If "upper handguard piece" were construed to require attachment to the upper receiver via a receiver sleeve, the language in the earlier claims specifically noting the attachment would be rendered superfluous.

Thus the plain meaning of the term controls. The term "upper handguard piece" plainly refers to the upper portion of the handguard, that is, the portion which is situated above the barrel. Nothing in claim 31 specifies any other limitation.

As used in claim 31 of the '465 Patent, "upper handguard piece" means *the portion of the handguard located above the barrel.*

### 2. *Rearward End*

■ Plaintiff suggests defining "rearward end" as "the end that faces in the direction of the forward portion of the firearm receiver." Defendants suggest a definition of "the end of the upper handguard piece that attaches to the upper firearm receiver."

Defendants assert that the upper receiver is attached to the handguard via a receiver sleeve and strive to have the Court construe all handguard-related terms to include attachment to the upper receiver via a receiver sleeve. This is yet another attempt to import additional limitations from the specification. Plaintiff's suggestion does not import any additional limitations, but it is unnecessarily complicated and confusing.

The '465 Patent, itself, lays out the definition of "rearward," stating that "the stock defines the rearward portion of the firearm." '465 Patent col. 5, ll. 5–6. As "rearward end" is used in claim 31 to describe a part of the upper handguard, the term thus refers to the end of the handguard closest to the stock of the fire-

arm, in contrast to the front end of the handguard, which is the end closest to the muzzle of the firearm.

As the parties came to agree at the *Markman* hearing, as used in claim 31 of the '465 Patent, "rearward end" means *the end of the handguard closest to the stock.*

### 3. Support/Supporting

■ Plaintiff's definition of "support" is "to bear the weight of, or hold up." Defendants initially provided a similar dictionary definition from the American Heritage Dictionary, defining "support" as "to bear the weight of ... [or] to hold in position." *The American Heritage Dictionary of the English Language, supra,* at 1739.

Defendants now state that Plaintiff's definition of "support" is "an acceptable starting point" but argue for a more complicated definition of "providing an ancillary positioning or strengthening function, including to bear the weight of, especially from below; to hold in position."

Defendants' new definition of "support" attempts to add the limitation that the support is "ancillary." Defendants' reasoning is that they believe the handguard of the '465 Patent requires at least two areas of support, and thus each area of support is only ancillary. Even if this assertion is true, Defendants are clearly attempting to import a limitation from the specification into claim 31.

As used in claim 31 of the '465 Patent, "support" or "supporting" means *to bear the weight of, or to hold up either completely or partially.*

### 4. Engage

■ Plaintiff urges the court to construe "engage" to mean "interlock." Defendants urge the court to construe "engage" to mean "contact" or "make contact," arguing that "engage" precludes any sort of clamping feature.

Figure 24 of the '465 Patent shows the yoke (on the right) engaging the barrel nut (on the left):

**FIG. 24**

The language of claim 31 makes clear that "engage" means more than simply "make contact." Claim 31 uses the term "engage" in describing the interaction between the yoke and the barrel nut:

> said U-shaped supporting yoke including engagement surfaces configured to cooperatively **engage** an outer surface of said barrel nut and *thereby support* said upper handguard piece relative to said barrel nut.

'465 Patent col. 17, ll. 9–13 (emphasis added). As engagement of the yoke and the barrel nut is meant to provide enough structure to support the upper handguard piece relative to the barrel nut, engagement must entail more than mere contact. However, defining "engage" as "interlock with" may go too far. The dictionary definition of "interlock" is "to unite or join closely as by hooking or dovetailing" or "to connect together ... so that the individual parts affect each other." *The American Heritage Dictionary of the English Language, supra.* There is nothing in claim 31 to suggest a requirement of hooking or dovetailing, but claim 31 could encompass a connection such that the individual parts affect each other by working together to

provide support. A proper definition must fall in between "contact" and "interlock," establishing contact between the yoke and barrel nut sufficient to provide support for the upper handguard piece.[3]

As used in claim 31 of the '465 Patent, "engage" means *to make contact with another part such that the resulting interaction can provide support.*

**FIG. 21B**

Defendants want "U-shaped" to be limited to the shapes of the yokes seen in Figures 21 and 26 of the '465 Patent, which have two parallel sides. Plaintiff argues for a broader definition, which would include semi-circles and other shapes.

Claim 31, itself, gives no guidance in defining "U-shaped" beyond conveying that the described object is shaped like the letter "U." The dictionary definition conveys a similar meaning. *See The American Heritage Dictionary of the English Language, supra* (defining "U" as "something shaped like the letter U"). There is, on the other hand, no support in the claim for Plaintiffs' position that "U-shaped" describes anything that is "open ended."

#### 5. U–Shaped

 Defendants define "U-shaped" as "precisely that [shape] illustrated by the letter 'U' itself, two upright elements connected at their ends by a curvilinear element." Plaintiff argues that "U-shaped" means "open on one side" or "open ended."

Figures 21B and 26B of the '465 Patent depict the "U-shaped" yoke:

**FIG. 26B**

Plaintiff's expert, John R. Nixon, declared that "one skilled in the mechanical arts would call U-shaped [anything] that [has] bent, angled, or tapered 'legs' extending from a curved bottom." (Pl.'s Br. in Resp. Ex. 10 at ¶ 4.) However, Mr. Nixon offers no support for this position.

Moreover, the '465 Patent elsewhere describes a "U-shaped device [as] having two upright elements interconnected by a curvilinear element." '465 Patent col. 9, ll. 41–43. This description features not "bent, angled, or tapered 'legs' " but rather "upright elements," consistent with the definition of "U-shaped" as "shaped like the letter U."

As used in claim 31 of the '465 Patent, "U-shaped" means *shaped like the letter "U."*

---

**3.** This sentiment was shared by the Patent Examiner who conducted an Inter Partes Reexamination of the '465 Patent. "It is the Examiner's opinion that the term 'engage' or 'engagement' necessarily requires at most some type of mechanical interaction or inter- locking of parts, or at least direct contact between two parts when configured in their final completed assembly." (Inter Partes Reexamination 6.) The Inter Partes Reexamination was not filed as an exhibit.

**170**

### 6. Yoke

█ Plaintiff urges the court to define "yoke" as "a clamp or vise that holds two parts together." Defendants construe "yoke" more generally as "something that connects or joins together, a bond or tie."

Figures 21–22 and 26–27 of the '465 Patent depict the yoke:

FIG. 21A

FIG. 21B

FIG. 21C

FIG. 21D

FIG. 21E

FIG. 22

FIG. 26A

FIG. 26B

FIG. 26C

FIG. 26D

FIG. 26E

FIG. 27

Plaintiff argues that "yoke" is commonly used to mean "clamp or vise," and provides a dictionary definition of "yoke" that supports limiting "yoke" to meaning a "clamp or vise."

Claim 31, however, uses "yoke" generally to refer to something that connects various parts of the handguard. The claim states that a "yoke" is "removably secured to [the] rearward end of [the] upper handguard" and "cooperatively engage[s][the] outer surface of [the] barrel nut." '465 Patent col. 17, ll. 7–12. The definition of "yoke" appears to be dependent on the definition of "engage," and the '465 Patent provides no further insight into what a "yoke" is other than that it "engages the barrel nut." '465 Patent col. 10, ll. 6–7.

The claim makes no mention of a clamp or vise; as such, these limitations will not be imported into the definition of "yoke." Defendants' definition does not preclude the yoke from being a clamp or a vise, but does not require it to be one, consistent with the language and structure of claim 31.

As used in claim 31 of the '465 Patent, "yoke" means *something that connects or joins together*.

### ORDER

The terms are construed as outlined above.